JUSTICE TRIEWEILER
dissenting.
I dissent from the opinion of the majority.
*127 Any group of people who, without a qualm, would take $1.5 million from a severely brain damaged man who can no longer care for himself in order to protect the secret maneuverings of a few lawyers, ought to have a better familiarity with the record than is demonstrated by the majority’s opinion.
After carefully reviewing the record, I conclude that the majority opinion has distorted the rulings of the District Court; ignored and wasted hours of conscientious service by the jurors who served in this case; and unjustly treated the victim whose efforts to reclaim some modicum of dignity have been dealt a severe set-back by this decision.
I have no quarrel with attorney-client privilege, nor the work product doctrine. Under the appropriate circumstances, those principles provide a necessary shield from exposure of an attorney’s candid communications and mental impressions. However, this opinion does not limit these worthwhile privileges to their intended defensive purpose. It allows them to be used as an offensive spear for the selective benefit of the insurer and its attorneys. It allows an insurer to selectively use records from its file which serve its self-interest, while denying its own policy holder an opportunity to search those same files for materials which are inconsistent. It allows the attorneys of an insurer to offer self-serving opinions and mental impressions, but denies the attorney for a policy holder the opportunity to effectively cross-examine the insurer’s attorney by knowing what his or her opinions or impressions were at an earlier time when decisions were made which were adverse to the policy holder’s interest and may have been a violation of our laws.
Neither the attorney-client privilege, nor the work product doctrine, were intended for such selective application as is permitted by the majority’s opinion.
To fully understand the injustice of this opinion, it is necessary to understand the actual events which led to the District Court’s decision compelling production of Farmers’ records. However, it is difficult to glean those events from the majority opinion which, to a large extent, simply sets forth as fact those arguments made in Farmers’ brief. Therefore, what follows is a more complete statement of the facts relevant to the legal issues raised on this appeal.
In considering these facts, it should be kept in mind that exceptions to attorney-client privilege and the work product doctrine exist where the party invoking the privilege intends to call his attorney as a witness or defend against a claim that he acted unreasonably by asserting that he acted in reliance on advice of counsel. Another *128 exception to the work product doctrine relating to mental impressions and opinions exists in a bad faith case, like this one, where the mental impressions and opinions of the defendant are the primary issue in the case.
David Palmer was severely injured on June 10, 1984, when the motorcycle that he was operating was forced off the road by a semi-truck and trailer that have never been identified. He notified Farmers Insurance Exchange, from whom he had purchased uninsured motorist coverage, of the incident within a short time after the accident. However, his policy had an exclusion for accidents caused without contact between the two vehicles. Farmers’ investigation consisted of an interview with the passenger on Palmer’s motorcycle and a review of the investigating highway patrolman’s report. There were no other witnesses to the accident, and because of the exclusion, nothing further was done to investigate the claim until over a year later.
On June 19,1985, we decided McGlynn v. Safeco Insurance Company of America (1985), 216 Mont. 379, 701 P.2d 735. In that case, we held that the exclusion relied on by Farmers was void as a matter of public policy. Following our decision in McGlynn, Farmers referred this case to the law firm of Smith, Walsh, Clark and Gregoire for further investigation and advice. From that point on, additional investigation was done by Bruce Vassar, the law firm’s investigator, and was reported to Farmers by members of the firm.
It was the law firm’s investigation and reports to Farmers which led to Farmers’ final rejection of Palmer’s claim in February 1986. In fact, that rejection was communicated to Palmer’s attorney by Marvin Smith, a member of the law firm. Following the denial of his claim, Palmer filed a complaint in the District Court on February 26, 1986, alleging that he was entitled to coverage for his injuries and that Farmers had acted unreasonably and was guilty of bad faith when it denied his claim.
In its answer, Farmers denied that it had acted in bad faith or violated any reasonable settlement practices. However, by that time the conduct of Farmers’ own employees, and the conduct of its attorneys and their investigator, were so interrelated that they could not, for practical purposes, be separated with regard to the issue of whether or not the claim had been reasonably denied.
On May 8, 1986, the District Court, pursuant to our decision in Fode v. Farmers Insurance Exchange (1986), 221 Mont. 282, 719 P.2d 414, bifurcated plaintiff’s claims and ordered that the underlying *129 claim for coverage pursuant to the uninsured motorist contract should be tried first, and that any bad faith should be considered after that case was resolved by settlement or judgment.
The contract claim went to trial on March 9, 1987, and a jury rendered its verdict in favor of Palmer on March 13, 1987. Bill Gregoire and Jim Walsh represented Farmers at that trial.
Following trial, Gregoire advised Farmers that he thought there were several technical bases for appeal to the Supreme Court, but also advised the company that even if the case was reversed by the Supreme Court, a second jury would probably return the same verdict in favor of Palmer. Farmers chose to proceed with the appeal anyway, reasoning that if it was successful on appeal, there would be some benefit to the bad faith claim which was still pending.
On September 13,1988, this Court rendered its decision affirming the judgment of the District Court.
On October 26,1988, Palmer’s attorney advised Farmers’ attorney that he was ready to proceed with the bad faith claim. In response to that notice, Gregoire, who was still acting as Farmers’ attorney, and who had complete authority to waive any privilege that his client could claim (see Drimmer v. Appleton (S.D.N.Y. 1986), 628 F. Supp. 1249), wrote the following letter to Palmer’s attorney:
Dear Dennis:
As we explained over the telephone, we do not believe that we can continue to represent Farmers Insurance Exchange in the action you have filed. There seems to be little question but that Marvin Smith, Jim Walsh, and myself will be witnesses in the action that is presently pending in the District Court. We would assume that you and Mr. Risjord would likewise be witnesses.
At that point in time, the only remaining issue to be decided in the bifurcated claim was whether Farmers had acted reasonably or in bad faith when it denied plaintiff’s claim for payment pursuant to his uninsured motorist policy. The information that Farmers relied on, and the impressions and opinions of its employees regarding its obligations to its insured, became the primary issues that remained in the litigation. Farmers’ claims adjusters, its attorneys, and their investigator acted in concert. There was no way to separate Farmers’ impressions or opinions from its attorneys’ impressions. There was no way to critique whether Farmers acted reasonably without considering the advice it relied upon from its attorneys. It is for these reasons that the Ninth Circuit Corut of Appeals in a similar case has *130 held that work product may be discovered in insurance bad faith claims. In Holmgren v. State Farm Mutual Automobile Insurance Company (9th Cir. 1992), 976 F.2d 573, State Farm was sued pursuant to § 33-18-201(2), (4), (6), and (13), MCA, of Montana’s Unfair Trade Practices Act. Judgment was entered for the plaintiff. On appeal, State Farm argued that the district court erred when it ordered the company to produce, and then admitted as evidence, handwritten memoranda drafted during the litigation of the underlying personal injury claim. The memoranda contained notes written by State Farm’s adjuster fixing a range of values for plaintiff’s claim which were far above any amount offered by State Farm. State Farm argued that the notes constituted opinion work product which was protected under Rule 26(b)(3), Fed.R.Civ.P. Our corresponding rule is identical. The Ninth Circuit disagreed. In affirming the district court, it held that:
We agree with the several courts and commentators that have concluded that opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling. See, e.g., Bio-Rad Labs., Inc. v. Pharmacia, Inc., 130 F.R.D. 116, 122 (N.D.Cal. 1990); Reavis [v. Metropolitan Property & Liability Ins. Co.], 117 F.R.D. [160,] 164 [S.D.Cal. 1987]; Handgards, Inc. v. Johnson & Johnson, 413 F.Supp. 926, 932-33 (N.D.Cal. 1976); Bird v. Penn Cent. Co., 61 F.R.D. 43, 47 (E.D.Pa. 1973); 4 J. Moore, Federal Practice ¶ 26.64 [3.-2], at 26-385 & n.8 (2d ed. 1991); J. Anderson et al., The Work Product Doctrine, 68 Cornell L.Rev. 760, 831-37 (1983). But see 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2022, at 188 n.97, 193, § 2026, at 229-32 (1970).
Both elements are met here. In a bad faith insurance claim settlement case, the “strategy, mental impressions and opinion of the [insurer’s] agents concerning the handling of the claim are directly at issue.” Reavis, 117 F.R.D. at 164. Further, Holmgren’s need for the exhibits was compelling. Montana permits insureds and third party claimants to proceed under § 33-18-201 against an insurer for bad faith in the settlement process. See Mont. Code Ann. § 33-18-242 (1979) (applicable to claims arising after July 1, 1987); Klaudt v. Flink, 202 Mont. 247, 658 P.2d 1065, 1067 (1983), overruled on other grounds, Fode v. Farmers Ins. Exch., 221 Mont. 282, 719 P.2d 414 (1986). Unless the information is available elsewhere, a plaintiff may be able to establish a compelling need *131 for evidence in the insurer’s claim file regarding the insurer’s opinion of the viability and value of the claim. We review the question on a case-by-case basis.
In Handgards, “the lawyers who managed and supervised the former litigation for the defendants [were] being called as witnesses to express their opinions as to the merits of the prior suits.” Handgards, 413 F.Supp. at 931. This comment, and others like it in “at issue” cases, is a practical acknowledgment of the fact that, in bad faith settlement cases, insurers may call their adjusters to testify to their opinions as to the lack of viability of the underlying claim. When an insurer chooses to remain mute on the subject, the plaintiff is not foreclosed from developing the same evidence.
Holmgren, 976 F.2d at 578.
The Holmgren decision refers to mental impressions and opinions of the insurer’s agents. In that case, the agents were adjusters. In this case, the agents were adjusters and attorneys. Farmers attorneys were involved in the investigation and evaluation of this case long before there was any lawsuit filed by Palmer. Their opinions, advice, and mental impressions cannot be separated from those of Farmers’ adjusters in the evaluation of the reasons for denying plaintiffs claim.
The majority adopts Farmers’ position that even if work product protection did not apply under these circumstances, the communications from Farmers’ attorneys, which were included in Farmers’ claims file, were protected by attorney-client privilege. However, Farmers waived any claim to attorney-client privilege when it advised Palmer, through Gregoire, that its attorneys would be called as witnesses in the bad faith case.
In discussing exceptions to the work product doctrine, the Ninth Circuit, in Holmgren, relied on Handgards, Inc. v. Johnson & Johnson (N.D.Cal. 1976), 413 F. Supp. 926. In addition to discussing the work product doctrine, that decision also dealt with a claim of attorney-client privilege under circumstances similar to those in this case. In Handgards, the defendant was accused of filing patent infringement suits against the plaintiff in bad faith as part of a conspiracy to restrain trade and monopolize the disposable plastic glove industry. The plaintiff learned that the defendant intended to call the lawyers who had handled the prior complaints as witnesses on its behalf. The plaintiff, therefore, sought discovery of any docu *132 ments generated by these attorneys which would indicate their purpose for filing the suits. The defendant objected, based upon a claim of attorney-client privilege. The district court held that by listing the attorneys as witnesses, the defendant had injected the advice of counsel as a defense, and thereby, waived the attorney-client privilege. It reasoned as follows:
By putting their lawyers on the witness stand in order to demonstrate that the prior lawsuits were pursued on the basis of competent legal advice and were, therefore, brought in good faith, defendants will waive the attorney-client privilege as to communications relating to the issue of the good-faith prosecution of the patent actions. Garfinkle v. Areata National Corp., [64 F.R.D. 688 (S.D.N.Y. 1974)]...; 8 Wigmore, Evidence § 2327 (McNaughton rev. 1961).
Handgards, 413 F. Supp. at 929.
That district court also discussed defendant’s objection to production of these materials on work product grounds. It held that:
The principal issue in the case at bar is the good faith of the defendants in instituting and maintaining the prior patent litigation against plaintiff. Plaintiff’s success in the instant action depends on a showing that defendants pursued the prior suits knowing they would be unsuccessful on the merits. Since the lawyers who managed and supervised the former litigation for the defendants are being called as witnesses to express their opinions as to the merits of the prior suits and the validity of the underlying patents, plaintiff has a particularized and compelling need for the production of the relevant work product of these attorneys. Without discovery of the work product, plaintiff will be unable to ascertain the basis and facts upon which the opinions of these witnesses are based. This will undoubtedly impair plaintiff’s ability for effective cross-examination on a crucial issue.
Handgards, 413 F. Supp. at 931.
Similarly, in Leybold-Heraeus Technologies, Inc. v. Midwest Instrument Company (E.D.Wis. 1987), 118 F.R.D. 609, the district court held that by calling their attorneys as witnesses the plaintiff waived the attorney-client privilege. In that case, both attorneys were listed for the purpose of testifying that the actions against the defendant had been commenced in good faith. However, the plaintiff sought to protect certain documents generated by those same attorneys based on the attorney-client privilege. The district court rejected that argument and held that:
*133 Upon namingtwo of their attorneys as witnesses, LHT and LHG assumed the risk that their claim of attorney-client communication and/or attorney work product would be abrogated. It is difficult for this Court to anticipate the parameters of the testimony of these two (2) attorneys, but certainly Mineo would be disadvantaged in cross-examining them, if it does not have available the basis for their testimony. Accordingly, this Court is of the view that many of the documents which Attorneys Hemmingway and Zapfe participated in, either as a recipient of communication or the communicator as to prior art or as to the good faith belief in the validity of the patents in question and the good faith in maintaining the lawsuits of both the present litigation and the Leco case, should be made available for discovery to Mineo.
This Court agrees with Minco’s assertion that LHT-LHG cannot selectively disclose portions of privileged communications or give testimony favorable to themselves, without concomitant disclosure of other unfavorable portions of the privileged communications relating to the same subject. See Handgards, Inc. v. Johnson & Johnson, 413 F.Supp. at 929; Teachers Ins., Etc. v. Shamrock Broadcasting Co., 521 F.Supp. 638, 641 (S.D.N.Y. 1981); First Federal Savings & Loan v. Oppenheim, Appel, Dixon & Co., 110 F.R.D. 557, 567 (S.D.N.Y. 1986); Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. at 1161.
Leybold-Heraeus Tech., 118 F.R.D. at 614.
Therefore, when the only remaining issue was whether or not Farmers had acted reasonably based on the information that was within its knowledge, and when, furthermore, Farmers notified plaintiff that its attorneys would be called as witnesses to establish that it acted reasonably, attorney-client privilege with regard to those attorneys’ communications to Farmers was waived and a specific exception to the work product doctrine was established.
The propriety of the District Court’s order compelling disclosure of Farmers’ claims file was further established by later developments. On September 13,1989, plaintiff took the deposition of Bud Rausch, defendant’s branch claims supervisor who was in charge of reviewing plaintiff’s claim. He was obviously a critical witness with regard to the issue of whether or not defendant had a reasonable basis for denying Palmer’s claim. Rausch testified that the selective manner in which Farmers documented statements from witnesses was based *134 on advice of counsel. He stated that their decision to retain a reconstruction expert, but then not call that expert at trial, was based on advice of counsel. He even stated that Farmers’ claims office had originally decided to pay plaintiff’s claim but then changed its mind, based on a conversation with Marvin Smith who based his recommendation on the investigation being conducted by the law firm’s investigator.
Rausch gave the following -unequivocal testimony which established that the only way Farmers could defend against plaintiff’s claim was based on advice of counsel:
Q. Okay. And you have already told us, and I will ask you again, in case you want to change your mind about this, in your initial conclusion to decline the case, in February 1986, you relied on not only the investigation, but the opinions and advice of the law firm Smith, Baillie, and Walsh?
A. That is true.
Q. And you continued to rely on their work on the trial and interviewing of the witnesses and their opinions during the trial about trial strategy?
A. They were the only firm they had employed at the time. We almost had to.
Q. Well, you did rely on it, whether you had to or not?
A. That’s correct.
The majority opinion attempts to excuse Rausch’s testimony based on the contrived argument that since Farmers had not pled “advice of counsel” as an affirmative defense, it was not a basis for waiving the attorney-client privilege. However, the important fact is that the claims person employed by Farmers who was principally responsible for denying plaintiff’s claim testified that he did so based on the advice of his attorneys. There was no way for plaintiff to determine whether he did so reasonably without knowing the substance of that advice. The only way to know the substance of that advice was to produce the claims file, including the correspondence which included the advice. The majority’s distinction between Rausch’s testimony and an affirmative defense is a distinction without a difference.
If there was any question about the purpose for which Farmers’ attorneys would be called as witnesses, that question was finally resolved when Farmers was compelled by order of the District Court to answer plaintiff’s written interrogatories. The interrogatories had been submitted by plaintiff prior to the underlying contract case, but had never been answered by Farmers. Finally, on July 9,1990, pursuant to *135 the District Court’s order dated June 18,1990, Fanners provided the following answer to Interrogatory No. 1 of plaintiff’s third set of written interrogatories:
Subject to the foregoing objections and without waiving the same, defendant states that Marvin Smith, James Walsh, and Bill Gregoire do have relevant knowledge concerning their actions in preparing the defense of defendant to plaintiff’s underlying lawsuit for uninsured motorist benefits and regarding what happened at the trial of that case. Any of them may be called as witnesses for the defendant as to those essentially factual matters. If called as witnesses, those individuals will not be examined regarding their confidential privileged communications to defendant regarding that underlying suit, or the instant bad faith action.
The defendant also listed Billings attorney Steve Harman as an expert, and in response to plaintiff’s Interrogatory No. 6 stated that:
Steve Harman is also expected to testify concerning the defense efforts by the lawyers for Farmers Insurance Exchange in defending and trying the underlying case and whether those efforts were reasonable under the circumstances of that case.
It is clear from these answers, that defendant intended to call its attorneys as witnesses and that they intended to testify regarding their conduct in handling the case. Their conduct in handling the case is inseparable, as a factual matter, from the conduct which gave rise to defendant’s denial of plaintiff’s claim. It is equally clear that Farmers intended to call an expert to testify regarding the reasonableness of its attorneys’ conduct, while at the same time denying plaintiff any access to the contemporaneous records kept regarding those attorneys’ conduct.
The majority opinion dismisses these answers to the interrogatories, without fully quoting from them, by pointing out Farmers’ self-serving statement that the witnesses would not be called for the purpose of disclosing confidential privileged information. In essence, the majority has held that Farmers and its attorneys can arbitrarily decide which of their communications are privileged and which are not, and testify to those matters which are favorable to Farmers’ defense while precluding plaintiff from discovering any matters which might be unfavorable to Farmers’ defense. Such a denial of meaningful cross-examination offends any notion of due process with which I am familiar.
Some mention should also be made of the manner in which Farmers actually defended itself at the time of trial. Plaintiff’s case was relatively brief. He called Bud Rausch, his treating physician, his *136 mother, and Lee Wise, an expert regarding the issue of bad faith. Farmers’ defense, however, consisted completely of testimony from its former lawyers and their investigator, as well as an expert consultant who based his testimony on a review of Farmers’ claims file, including the reports issued to Farmers by its attorneys.
Vassar testified about the investigation he conducted; the witnesses he contacted; the substance of what he was told by those witnesses; and the difficulties he encountered when dealing with the investigating highway patrolman.
Walsh testified that he assisted Gregoire as one of the defense attorneys representing Farmers in the underlying trial. He gave extensive testimony about the expert witness that Farmers had consulted and what that expert’s conclusions were, even though the witness had not been called in the underlying trial. He gave his opinion about why they were able to defend during the trial without calling an expert witness, and evaluated the testimony of Farmers’ principal factual witness in the underlying trial.
Gregoire, who also represented Farmers in the underlying trial, testified extensively about tactical decisions and his evaluation of witness testimony in the underlying case. He testified about his interviews with witnesses; his investigation; and his personal evaluation of the merits of plaintiff’s underlying claim. He explained how his firm arrived at the evaluation which led to the denial of plaintiff’s claim. He explained their mental processes as they gathered sometimes contradictory information from various witnesses, and told why some witnesses had greater credibility, in his mind, than others. He was allowed to give his personal evaluation of various experts who testified in the underlying case, and repeatedly read from testimony in that case and then gave his analysis of the testimony. He conceded that Farmers spent $100,000 to defend plaintiff’s underlying claim for $50,000, and explained at length why it was reasonable to spend twice as much as plaintiff was claiming in an effort to defeat him.
Frank Weedman was a retired claims representative for State Farm Auto Insurance Company who was called by Farmers as an expert to give his opinion that Farmers had acted reasonably. He testified that he had been retained by George Dalthorp, Farmers’ attorney in Billings, to testify on numerous previous occasions. He acknowledged that in forming his opinion it was necessary for him to review Farmers’ claims file, including correspondence from Farmers’ law firm to the claims department. If it was necessary for Weedman *137 to consult the file, how could it be any less necessary for plaintiff’s attorneys to have the same information?
It is clear from the November 15, 1988, correspondence, defendant’s answers to interrogatories, Rausch’s deposition, and the testimony that was actually given at trial, that defendant’s attorneys were always intended to be the principal factor in Farmers’ defense. Yet Farmers would have foisted that testimony on the court and jury without any meaningful opportunity for plaintiff to cross-examine these witnesses. The majority, by this opinion, has approved of that trial tactic.
In doing so, the majority opinion also suggests that the District Court tinned over the Smith law firm’s litigation files on a wholesale basis without any justification for doing so. Nothing could be further from the truth. The District Court’s original order compelling production of Farmers’ files compelled production of only those files generated prior to the time that plaintiff’s bad faith complaint was pursued. It did not include any of the Smith Firm’s litigation files. However, after Walsh was called to testify on behalf of defendant, plaintiff’s attorney requested the court to order production of those witness files referred to during Walsh’s testimony. Plaintiff argued that Walsh waived any privilege pertaining to those files as a result of his testimony. Defense counsel conceded that there was a waiver of any privilege concerning defendant’s expert witness file, but disagreed that there was a waiver with regard to any other witness. After listening to arguments, the District Court agreed that the privilege had not been waived with regard to the Smith Firm’s entire file. The following conversation took place:
THE COURT: That’s where the difficulty comes in is where do you draw the parameters on what’s happened? And I would just suggest that Mr. Walsh collect his files and show it to counsel, and if there has to be an in camera inspection, we’ll do that.
MR. CONKLIN: Collect what files, your honor?
THE COURT: The files relative to his testimony. It is a rather broad testimony, as Mr. Risjord has pointed out. Speed, the truck being on the right side of the road. I mean, you’re getting right into the guts of the case.
THE COURT: I am going to request that — and I don’t know how your files how, but would you collect those files and show them to *138 Mr. Nybo and Mr. Conklin sometime this afternoon, and then we will have to sort through this.
THE COURT: Produce it to your counsel for Farmers Insurance Exchange, Mr. Nybo and Mr. Conklin. In that way we can sort through it, okay? That’s the only way that I — and then we can go from there. You are going to produce — you are going to go through the file and produce to counsel for the plaintiff those matters that you have no question about that have been waived. And I take it then the matters that you have a question about — you are going to reserve that for an in camera inspection.
As the actual transcript shows, the District Court was very circumspect and cautious about ordering the production of attorneys’ files, while at the same time recognizing that it would be inherently unfair to allow Farmers’ attorney to testify about his mental impressions while protecting the actual record of those impressions from discovery by plaintiff. The District Judge stated that when Walsh took the stand:
That placed the advice of counsel squarely at issue in these proceedings. To rule any other way, it is this Court’s opinion, would create a very obvious unfairness in this case. There would be no way for counsel for the plaintiff to adequately cross-examine Mr. Walsh in terms of his testimony that took place yesterday.
Most importantly, the court stated that:
The court’s rulingis not to be interpreted as a general broad ruling. The ruling is, of necessity, limited to only the testimony that was transcribed yesterday concerning Mr. Walsh’s testimony. In other words, counsel is only allowed to get into those areas that were testified to by Mr. Walsh, and I am limiting this ruling narrowly to that testimony. The entire file is not open. It is only open in regard to the matters that were testified to.
The District Court then ordered that Walsh’s testimony be transcribed. The following day the District Judge went through that testimony line-by-line with counsel for both parties so that a determination could be made as to the exact extent of the waiver. As a result of that line-by-line examination, he ordered that all information regarding the expert witnesses that Walsh worked with be produced; he ordered production of information from witnesses that Walsh talked to about plaintiff’s speed; he ordered that files which had to do with witnesses Atcheson and Diacon be produced; and he *139 ordered that Vassar’s notes be produced since he had testified. Finally, the District Judge made it clear that if there was something the parties could not agree on, they could contact the court for an in camera inspection because the court, at that time, did not know what was in the Smith firm’s files. After that hearing, the court recessed for the production of the records indicated. After that recess, defendant’s attorneys pointed out that there were 32 subfiles in the Smith Firm’s litigation records and that some of them had been produced and others were not produced. However, no further request was made by attorneys for defendant for an in camera review of any disputed files.
The impression created in the majority opinion that wholesale production of the Smith Firm’s file was ordered, without any in camera review, is a total distortion of the procedure followed by the District Court.
At every step of the proceedings in this case, the District Court ordered the minimal amount of disclosure that could be permitted without denying plaintiff a meaningful opportunity to develop the issue with which the case was concerned, and cross-examine the witnesses that defendant intended to call. The District Court’s orders were a model of restraint and should serve as an example for future bad faith litigation, rather than be the majority’s excuse for reversing another major verdict against another insurance company found to have abused its insured.
Neither is it correct to conclude that defendant has satisfied the burden imposed by § 25-11-102, MCA, for reversal of the District Court judgment. Even if the majority concluded that the original communications which were the subject of the District Court’s order for production were privileged and should not have been produced, there was nothing contained in those records which were prejudicial to defendant. Almost all of the information in the correspondence from the attorneys to Farmers was a factual explanation or legal analysis of why Farmers was justified in denying plaintiff’s claim. If the majority had reviewed these records, it would be clear to them that production of the records was not prejudicial to defendant. In fact, the majority of the information included in those reports was relied upon by Farmers in defense of the bad faith case.
Finally, I dissent from that part of the maj ority opinion which holds that an insurer’s decision to appeal the verdict in an underlying case is not admissible as evidence of bad faith. The insurer has a continuing obligation to pay a claim when liability is reasonably clear, and *140 the fact that it may have a technical basis for retrying a case does not establish as a matter of law that there is a reasonable issue about liability. The more reasonable approach to this issue is that adopted by Montana’s Federal District Court in Kyriss v. Aetna Life and Casualty Company (D.Mont. 1986), 624 F. Supp. 1130. In that case, Aetna moved the Federal District Court to strike that part of plaintiff’s complaint which alleged that Aetna acted in bad faith and solely for the purpose of delay in appealing the underlying personal injury verdict to the Supreme Court of Montana. In denying that motion, the court held that:
Evidence that an appeal was taken in bad faith is neither inconsistent with the general tort principles expressed by the Montana Supreme Court, nor is it inconsistent with the legislative intent expressed in § 33-18-201(6), MCA. The statute speaks generally in terms of “claims,” but does not indicate that “claim” is to be given anything but its ordinary meaning, which includes “cause of action.”
Aetna’s jurisdictional argument fails for the same reasons. Section 33-18-201 would be stripped of its effectiveness if it did not allow the court to consider all stages of the negotiation and litigation process. Appeal is but one part of that process. Rule 32, M.R.App.P., does not alter this conclusion; it merely gives the Montana Supreme Court authority to award “proper” damages if it “is satisfied from the record and the presentation of the appeal” that the appeal was taken for purposes of delay only. This rule does not deprive a trial court, state or federal, of jurisdiction to consider the motive behind a decision to appeal as one factor in a claim for bad faith against an insurance company. At the appellate level, the decision that an appeal is frivolous is based purely on the trial record and on the appellate briefs and arguments. In a bad faith action, it becomes a question for the jury, to be considered in view of all the plaintiff’s evidence of the insurer’s conduct in negotiations from start to finish. Of course, if there is sufficient evidence to show a good-faith basis for the appeal as a matter of law, an appropriate motion for directed verdict may be entertained. See, St. Paul Fire & Marine Ins. Co. v. Cumiskey, [204] Mont. [350], 665 P.2d 223 (1983).
Similarly, Aetna’s position that plaintiff’s claims constitute a “chilling effect” on Aetna’s right of access to the courts is without merit. Parties to a state suit in Montana are free to appeal an adverse decision to the state supreme court; review is not discre *141 tionary. In this case, the subject matter of Aetna’s appeal was the underlying malpractice action, and the issue concerned the proper standard of causation. The subject matter of the instant action is the conduct of Aetna throughout the pendency of plaintiff’s malpractice claim — prior to, during, and after trial. The issue of Aetna’s bad faith in claims settlement practices is a jury question, and the jury should consider all the facts of the case in reaching its verdict. Montana has enacted a broad legislative scheme for the regulation of insurance companies in accordance with federal law and with the Montana Constitution.
Kyriss, 624 F. Supp. at 1133.
Likewise, in this case, Farmers has a duty pursuant to § 33-18-201, MCA, to effect prompt settlement of claims where liability is reasonably clear. That obligation did not end when plaintiff’s complaint was filed. It continued through the pendency of that claim and following judgment by the District Court.
Insurance companies have tremendous resources with which to use litigation and appeals to drain their insureds financially and leverage settlements which are otherwise unreasonable based upon the facts of the claim. Whether or not Farmers did that in this case was a factual issue for the jury to decide. Furthermore, that issue was resolved by the jury in this case based on facts which were not evident to the Supreme Court from the record on appeal from the underlying trial. Therefore, any sanction that this Court could have imposed based on the record in that appeal was not adequate to deter an appeal taken solely for the purpose of unreasonably delaying payment of plaintiff’s claim.
This decision is a serious blow to those who believe in the statutory obligation that insurance companies have to treat their insureds in a reasonable manner. It is an even more serious blow to those who believe that when one party calls a witness, our rules of discovery were intended to provide the other party with a reasonable opportunity to cross-examine that witness by discovering the factual bases for that witness’s opinions and conclusions.
The practical effect of this decision is that insurers can delegate their statutory obligation to investigate claims to a law firm, they can deny those claims based on the advice of that law firm, and then, when the company is accused of violating Montana law by denying the claim unreasonably, the insurer can defend on the basis that it relied on the firm’s investigation and advice, while the plaintiff is *142 denied an opportunity to discover the substance of that advice or what the investigation disclosed.
As sine as night follows day, this opinion will spawn a series of “Palmer” seminars around the State where claims adjusters for insurance companies are taught how to mistreat their insureds with impunity by running the records of their mistreatment through law firms which will be glad to assist with their investigation for a fee.
The majority opinion represents a classic example of the legal profession taking care of its own at the expense of everyone else. Hopefully, with the passage of time, this decision will become a relic of an unenlightened period in this Court’s history when the rights of individuals were less important than the rights of insurance companies and those law firms that represented them.
However, that will not be much consolation to the District Court or jurors who gave so generously of their time to do the right thing in this case. And, it will not do much good for David Palmer who, at least briefly, thought the law was bigger than his insurance company.
For these reasons, I dissent from the majority opinion.
JUSTICE HUNT joins in the foregoing dissent.